# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IRONBEAM, INC., | ) |
|       Plaintiff/Counter-Defendant, | ) ) ) |
| v. | ) No. 18 C 1287 ) ) Judge Sara L. Ellis |
| ERIK EVERT, | ) ) |
|       Defendant/Counter-Plaintiff. | ) |

## OPINION AND ORDER

Defendant Erik Evert had a terrible, horrible, no good, very bad day on August 14, 2017, when in the span of a few hours, his newly opened trading account suffered losses in excess of $120,000, he learned that his account had no default risk protections in place to halt those losses, he had to admit he allowed a third party to trade using his account in violation of his customer agreement, and Plaintiff Ironbeam, Inc. ("Ironbeam"), a commodity broker registered as a Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC"), sought payment from him of both the debit balance in the account as well as the liquidation fee – putting him on the hook for over $150,000. After the close of fact discovery, Ironbeam filed a motion for summary judgment against Evert for breach of contract for failure to pay the debit balance remaining on trades made with his user ID, or in the alternative, for breach of their settlement contract. In response, Evert asserts two affirmative defenses: (1) that the original contract, the Customer Service Agreement ("Agreement"), is a contract of adhesion, procedurally and substantively unconscionable, and therefore, void; and (2) that there was no meeting of the minds and no definite terms for the settlement agreement; therefore, the settlement agreement is unenforceable. Evert also brings two counterclaims asserting consumer

fraud, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/10a, and breach of fiduciary duty. Because the Court finds that the Agreement is a valid contract, not a contract of adhesion or unconscionable, and that Ironbeam did not engage in consumer fraud or breach a fiduciary duty, the Court grants Ironbeam's motion for summary judgment and enters judgment against Evert on the complaint and counterclaims.

## BACKGROUND[1]

On August 5, 2017, Evert responded to a Craigslist advertisement entitled "let a high level trader make you money." Doc. 40-1, Ex. E at 1. Following a brief email exchange, Evert and the Craigslist advertiser, Lon Richardson[2], entered into an agreement under which Evert would open a trading account funded with at least $10,000 and Richardson would use that account to turn a daily profit of $1,000 by trading crude oil futures.

On August 10, Evert opened a commodity futures trading account with Ironbeam through DeepDiscountTrading.com ("Deep Discount"). Evert electronically signed the contract labeled "Ironbeam Customer Agreement," which included "Acknowledged Customer Agreements and Risk Disclosure Statements." *Id.*, Ex. A at 3–11. The Agreement lays out several specific obligations for the Customer: that the Customer agrees to "provide to and maintain with Ironbeam sufficient funds to meet the applicable initial and maintenance margin requirements," *id.* at 4 ¶ 7, to "immediately wire transfer funds to Ironbeam in order to adequately meet

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts. The Court has considered Evert's statement of disputed fact and included in this background section only those portions of the statements that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Evert, the non-movant.

[2] Richardson is on the CFTC's radar for his activity in soliciting and trading customer accounts. Unfortunately for Evert, the CFTC filed an enforcement action against Richardson after he solicited Evert and used Evert's account. Doc. 39 at1(fn. 1).

additional margin when and as required and demanded by Ironbeam," *id.*, and that the Customer would at all times "be liable for the payment of any debit balance upon demand by Ironbeam and shall be liable for any deficiency remaining in Customer's account(s) in the event of the liquidation thereof," *id.* at 5 ¶ 8. Additionally, the Customer agreed that Ironbeam could debit his or her account for "customary brokerage and commission charges and for charges for any other services rendered by Ironbeam, including . . . margin call/risk liquidation fees." *Id.* at 5–6 ¶ 11. Finally, though not exhaustively, the Agreement includes a provision for the Customer to pay Ironbeam's attorneys' fees in the collection of a debit balance. *Id.* at 11 ¶ 40.

In his account application, Evert represented that he had ten years of futures and options trading experience, a net worth of $20,000,000, an annual income of $250,000, and an approximate risk capital of $100,000. He also represented that there was no third-party discretionary trader for his account. Evert had not seen any Ironbeam advertisements before opening his account; indeed, he did not know of Ironbeam until after he opened the account. Evert believed his contract and account were with Deep Discount.

Despite his representations in his account application, Evert provided his login and password to Richardson, who is not affiliated with Ironbeam. On August 11, Evert deposited $10,000 into his account to be used in trading futures. On August 14, Richardson entered several trades into Evert's account. Although the Ironbeam clerks who set up new customers' accounts are supposed to enable default risk procedures, the clerk who set up Evert's account failed to do so. Ironbeam had not put any trading limitations on Evert's account; however, the same morning that Richardson had entered these trades, Ironbeam noticed the activity and called Evert to discuss the positions in his account. Evert indicated that he had not logged into his account but did not disclose the fact that he had given Richardson access to the account and authority to

make trades. Ironbeam called Evert again less than twenty minutes later to "try[] to figure out" the "weird activity" going on in Evert's account. Doc. 40 ¶ 19. Evert still did not disclose Richardson's role in this activity. About ten minutes later, Evert called Ironbeam and indicated that "something goofy" was going on. *Id*. ¶ 20. In this phone call, Evert first disclosed that he had "an advisor" but that he now could not reach the advisor. *Id.* After further questioning, and after Ironbeam informed Evert that someone using his user ID placed the trades, Evert admitted that the "advisor" was trading the account on Evert's behalf.

At the time of the last call, the debit balance in Evert's account was negative $77,000 and Ironbeam indicated that it would be liquidating the positions. By the time Ironbeam was able to fully liquidate the positions, the debit balance in the account grew to negative $126,183.36. Ironbeam's standard liquidation fee is $50 per contract. Richardson had entered 750 futures contracts in Evert's account, amounting to a $37,500 total liquidation fee. Had the default risk procedures been in place, Evert should have only been able to place around twenty contracts. Because Ironbeam is the guarantor of Evert's account, Ironbeam had to pay the commodity futures exchange clearinghouse the full amount of Evert's debit balance.

Ironbeam then demanded that Evert pay for reimbursement because Evert agreed to cover all trading losses and debit balances in the Customer Agreement. On August 16, Evert paid $5,000. By email on August 17, Evert proposed a payment plan of $10,000 due on August 30, with a monthly payment of $10,000 to $15,000 for the first "couple of months" and monthly payments escalating after that until he paid the debit balance in full. *Id*. ¶ 24. On August 31, and again on September 29, Evert made a payment to Ironbeam of $10,000. Evert did not make another payment. The current debit balance in his account is $101,286.96.

After Ironbeam liquidated Evert's account, Justin Dendinger, whose relation to either party is unknown to the Court, called Ironbeam to ask about account creation and risk management. Ironbeam told him "that it is virtually impossible for such a problem to occur since Ironbeam has risk management procedures in place to where positions would be closed when the account was down to 25%." Doc. 40 ¶ 46. However, Ironbeam has no system or procedure to close out positions to refuse trades when an account suffers a 25% loss or any predetermined loss. *Id.* ¶ 50-51. Thus, it is commonplace for customer accounts to suffer losses greater than the amount of funds in the account and thereby suffer a debit balance. Id. ¶ 53.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

ANALYSIS

Ironbeam argues that this is a straightforward contract claim: the Agreement includes a provision by which Evert agreed to pay all trading losses and debits and Evert has not done so; therefore, Ironbeam is entitled to performance. In the alternative, Ironbeam claims that the parties had a valid and enforceable settlement agreement and that Evert had begun to perform under that agreement but has since stopped; thus, Evert must comply with the terms of that agreement.

Evert responds that the Agreement was unconscionable and a contract of adhesion, that the settlement agreement was never a valid contract, and that Ironbeam engaged in consumer fraud and breached its fiduciary duties. Evert does not argue that he did not breach the Agreement or the settlement agreement. He focuses his claims solely on the validity of both contracts. Ironbeam has moved for summary judgment on its claims and Evert's counterclaims. The Court addresses each issue in turn.

I. **Validity of the Customer Agreement**

The Court must first decide whether there is any genuine issue of material fact regarding the validity of the Agreement. Evert argues that the Agreement is invalid because it is a contract of adhesion and is both procedurally and substantively unconscionable.

"In determining whether a valid agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). Under Illinois law, provisions of a contract may be procedurally or substantively unconscionable. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014) (citing *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622, 222 Ill. 2d 75, 305 Ill. Dec. 15 (2006)). "Procedural unconscionability refers to

a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor*, 854 N.E.2d at 622. In determining whether an agreement is procedurally unconscionable, the Court considers several factors, including "whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647, 242 Ill. 2d 48, 350 Ill. Dec. 847 (2011) (citation omitted).

"A contract of adhesion is a contract submitted by one party to another on a take-it-or-leave-it basis, without any opportunity to negotiate its terms." *Martinell v. Navistar Int'l Corp.*, No. 11 C 8707, 2012 WL 2503964, at *3, (N.D. Ill. June 28, 2012) (citing *Larned v. First Chicago Corp.*, 636 N.E.2d 1004, 1006, 264 Ill. App. 3d 697, 201 Ill. Dec. 572 (1994)). Simply a lack of opportunity to negotiate terms or a disparity in bargaining power will not create a contract of adhesion. *Larned*, 636 N.E.2d at 1006. "An unconscionable bargain is one which no reasonable person would make and which no honest person would accept." *Id*.

Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267, 223 Ill. 2d 1, 306 Ill. Dec. 157 (2006). "Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id*.

A.  **Procedural Unconscionability**

Evert claims that the contract was procedurally unconscionable because "there was no negotiation or explanation," he "believed the contract was with Deep Discount," the terms were "all uniform in fine size and appearance," and there was "no distinction between the risk management disclosures, the liquidation procedures or the general administration of an account." Doc. 44 at 6–7.  Yet, nothing from this smattering of unsubstantiated claims sticks.

To begin, some of these claims are simply untenable.  As an electronic contract, Evert had the ability to enlarge the font of the Agreement to larger than "fine size," whether through an operation on the customer website or increasing the zoom of the monitor on which he viewed the Agreement.  Furthermore, each of the 40 provisions is in uniform font size and clearly labeled with an appropriate heading to describe its content, which goes directly against his claim that there was no distinction between certain terms and that "[l]iterally, every material and important term of agreement is buried in a maze of legalize [sic]." *Id.* at 7; *see Davis v. Fenton*, 26 F. Supp. 3d 727, 738 (N.D. Ill. 2014) (finding that uniform font size and separate sectioning and labeling of agreement weighed against a finding of procedural unconscionability).  None of these clearly labeled provisions are "so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Razor*, 854 N.E.2d at 622; *Brown v. Luxottica Retail N. Am. Inc.*, 09 C 7816, 2010 WL 3893820, at *1–3 (N.D. Ill. Sept. 29, 2010) (finding a dispute resolution agreement in the middle of a fifty-one-page employee handbook was neither hidden nor buried).  Additionally, while it may be true that Evert believed the contract, entitled "Ironbeam Customer Agreement" and containing the name "Ironbeam" over 200 times, was with Deep Discount, the Court is confident in finding that he had the opportunity to understand that the contract was indeed with Ironbeam.  *See Rosen*, 949 N.E.2d at 647; *Vargas*

*v. Esquire, Inc.*, 166 F.2d 651, 654 (7th Cir. 1948) ("[A] man in possession of all his faculties, who signs a contract, cannot relieve himself from the obligations of the contract by saying he did not know or understand what it contained.").

Furthermore, Evert's argument that the Agreement was a contract of adhesion fails. Although the Agreement was a form contract, with Evert lacking the opportunity to negotiate its terms, Evert still freely chose to open his account with Ironbeam through Deep Discount from among a number of other brokers offering similar services. *Montgomery v. Corinthian Colls., Inc.*, No. 11 C 365, 2011 WL 1118942, at *3–4 (N.D. Ill. Mar. 25, 2011) (finding agreement was not procedurally unconscionable or an adhesion contract and noting "that form contracts like the ones at issue here are a fact of modern life even if the average consumer does not completely understand them"); *Larned*, 636 N.E.2d at 1006 ("In the present case, the Visa card agreement is not an adhesion contract since Larned freely chose to obtain this Visa card from among a number of other credit cards offering similar benefits.").

Thus, finding that the Agreement was neither procedurally unconscionable nor a contract of adhesion, the Court next turns to the issue of substantive unconscionability.

### B. Substantive Unconscionability

Evert argues that the Agreement is substantively unconscionable because "[t]here is no mutuality in the Ironbeam agreement" and that "the agreement itself is invalid as totally one-sided and oppressive." Doc. 44 at 7. While Ironbeam may benefit from many of the contract provisions, Evert does not point to any single provision that "unfairly surprise[d]" him. *Kinkel*, 857 N.E.2d at 267. Although the Agreement makes clear that most of the risk in opening a futures trading account with Ironbeam falls on the customer, a thorough review of the contract does not disclose, nor does Evert direct the Court's attention to any provision that is inordinately

one-sided or oppressive. *Rosen*, 949 N.E.2d at 656 (finding contract was not substantively unconscionable where the terms were not inordinately one-sided, hidden, or unclear, and did not unfairly surprise defendant). Finding no further citations to the Agreement or any relevant caselaw, and no further argument from Evert that the Agreement is substantively unconscionable, the Court concludes that it is not.

The Court finds that the Agreement was neither procedurally nor substantively unconscionable, nor was it a contract of adhesion. Therefore, because the parties do not otherwise dispute its validity, the Court finds that the Agreement was a valid, enforceable contract.

### III. Breach of Contract Claims

Having found that the Agreement is valid and enforceable, the Court turns to Ironbeam's substantive claim that Evert breached the Agreement. Ironbeam's breach of contract claim is based on a few specific paragraphs of the Agreement. Paragraphs 7 and 8 state that the Customer will "without notice or demand, maintain adequate margin at all times so as to continuously meet the margin requirements established by Ironbeam" and "immediately wire transfer funds to Ironbeam in order to adequately meet additional margin when and as required and demanded by Ironbeam," and that he will be liable for "the payment of all liabilities of Customer due to Ironbeam" and that he will "pay, upon demand, the deficit and all unpaid liabilities." Doc. 40-1, Ex. A ¶¶ 7–8. The current debit balance in Evert's account is $101,286.96. Doc. 40 ¶ 26. Paragraph 40 states that the Customer agrees to pay "all expenses, including attorney's fees, incurred by Ironbeam . . . to collect any debit balances in Customer account(s)." Doc. 40-1, Ex. A ¶ 40.

According to Ironbeam's schedule of fees, Ironbeam also has a liquidation fee of $50 per contract. Doc. 40-1, Ex. J at 2. As a result of Evert's losses, Ironbeam had to liquidate 750 futures contracts in Evert's account, amounting to a $37,500 liquidation fee. *Id*. Evert argues that this liquidation fee is an unenforceable liquidated damages penalty. Liquidated damages are "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." Black's Law Dictionary (11th ed. 2019). A liquidated damages clause generally represents an agreement by the parties of an estimated amount of injury one party would suffer if the other party breaches the contract in situations where one could not readily ascertain an actual amount of injury. Even though "liquidation fees" and "liquidated damages" both share a root in the word "liquidate," Evert's attempt to conflate the two is unpersuasive. Ironbeam applied the liquidation fees to Evert's account pursuant to the schedule of fees he received when he opened his account, not pursuant to any liquidated damages clause in the contract. Doc. 40-1, Ex. J. Furthermore, these fees for liquidating each individual contract in Evert's account are more analogous to overdraft fees, which are decidedly not liquidated damages. *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 609, 278 Ill. App. 3d 307, 214 Ill. Dec. 1036 (1996) ("[O]verdraft fees are not liquidated damages."). The Court thus finds that Ironbeam's liquidation fee for the individual contracts in Evert's account is not an unenforceable liquidated damages penalty.

By the terms of the Agreement, therefore, Evert owes Ironbeam the amount of the current debit balance, $101,286.96, and the $37,500 liquidation fee, plus interest, costs, and attorneys' fees. Evert has not paid this sum even though Ironbeam demanded it. The Court, therefore, finds that Evert breached the Agreement and enters judgment against Evert on Count I of Ironbeam's amended complaint in the amount of $138,786.96 plus interest, costs, and attorneys'

fees. Because Ironbeam asserted Count II of its amended complaint regarding the settlement agreement as an alternative ground for recovery in the event that the Court did not find the Agreement valid and enforceable or that Evert breached the Agreement, the Court dismisses Count II as moot.

## II. Evert's Counterclaims

Evert claims that Ironbeam committed consumer fraud and violated a fiduciary duty to Evert by not implementing trading restrictions on Evert's account. The Court first addresses Evert's consumer fraud counterclaim.

### A. ICFA Counterclaim

Despite Evert's assertion to the contrary, Ironbeam directly addressed his consumer fraud counterclaim. *See* Doc. 39 at 11. To establish an ICFA violation, 815 Ill. Comp. Stat. 505/10a, Evert must show: (1) a deceptive or unfair act or promise by Ironbeam; (2) Ironbeam's intent that Evert rely on the deceptive or unfair act or promise; and (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014). Evert's relies on Dendinger's testimony to show a deceptive or unfair act or promise, claiming that Ironbeam told Dendinger that it had risk management procedures in place and that Ironbeam's program would refuse trades once an account was down to 25%. Doc. 40 ¶¶ 46–47. Even if Ironbeam made such a promise to Dendinger, Evert cannot possibly show that Ironbeam intended that Evert rely on the deceptive or unfair act or promise, because Ironbeam made these statements *after* his injury. Because he cannot overcome this logical and temporal impossibility, Evert's consumer fraud counterclaim fails. *See Ehrhart v. UNUM Life Ins. Co. of Am.*, No. 99 C 1340, 1999 WL 498597, at *2–3

(N.D. Ill. July 2, 1999) (finding plaintiff could not show defendant induced his agreement to a contract with lies "after the fact").

### B. Breach of Fiduciary Duty Counterclaim

Under Illinois law, to establish a claim for breach of fiduciary duty, Evert must show: (1) Ironbeam owes Evert a fiduciary duty; (2) Ironbeam breached that duty; and (3) Ironbeam's breach caused Evert damages. *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (citing *Neade v. Portes*, 739 N.E.2d 496, 502, 193 Ill. 2d 433, 250 Ill. Dec. 733 (2000)).

It is unclear whether Evert asserts that Ironbeam's alleged breach absolves him of his duty of performance under the Agreement or that this breach caused him damages in the amount of roughly what he would owe Ironbeam under the Agreement. Either way, for Evert to succeed, the Court must first find that Ironbeam owed a fiduciary duty to Evert.

"Only a broker operating a discretionary account—in which the broker determines which investments to make—is a fiduciary." *CFTC v. Heritage Capital Advisory Servs. Ltd.*, 823 F.2d 171, 173 (7th Cir. 1987); *see Stotler & Co. v. Dierschke*, No. 88 C 7135, 1993 WL 128141, at *3 (N.D. Ill. Apr. 21, 1993) (ruling that broker on nondiscretionary account did not owe fiduciary duty to customer); *ADM Inv'r Servs., Inc. v. Collins*, No. 05 C 1823, 2006 WL 224095, at *6 (N.D. Ill. Jan. 26, 2006) (same). A broker does, however, owe a fiduciary duty to its customer to faithfully execute the customer's orders. *Anspacher & Assocs., Inc. v. Henderson*, 854 F.2d 941, 945 (7th Cir. 1988).

Evert argues that Ironbeam breached its fiduciary duty to faithfully execute the customer's orders by not implementing "default protocols" that would have stopped Evert from making orders that resulted in massive losses. Evert argues that Ironbeam's alleged breach is

13

analogous to the breach in *Anspacher*. However, these cases are factually distinguishable. In *Anspacher*, the customer alleged that the broker failed to liquidate his positions upon his request and failed to close his account upon his instruction, which led to the customer realizing a significantly greater financial loss than he would have if the broker had faithfully executed his orders. 854 F.2d at 945. Here, just like in *Collins*, Ironbeam did exactly as Evert ordered. *Collins*, 2006 WL 224095, at *7. Indeed, it is precisely because Ironbeam faithfully executed Evert's (or Richardson's) orders that Evert realized such a significant financial loss. The fiduciary duty contemplated in *Anspacher* does not extend to force Ironbeam to install protections in order to shield Evert from his own orders. *Id.* ("*Anspacher* involved allegations that the broker failed to liquidate the customer's positions upon the customer's request and failed to follow the customer's instructions to close out the account, whereas the instant case involves a broker who executed the orders that Collins placed."). The Court agrees with the *Collins* court that *Anspacher* does not suggest that brokers owe their customers a fiduciary duty to implement risk management protocols. *Id.* ("The decision in *Anspacher* in no way suggests that brokers owe their customers a fiduciary duty to enforce initial margin requirements set by an exchange.").

Evert also argues that Ironbeam "usurped control" over Evert's account, turning Evert's account into a discretionary one and placing a higher fiduciary duty on Ironbeam. *Heritage Capital*, 823 F.3d at 173; *Martin v. Heinold Commodities, Inc.*, 487 N.E.2d 1098, 1101–02, 139 Ill. App. 3d 1049, 94 Ill. Dec. 221 (1985) ("However, a broker may become the fiduciary of his customer in a broad sense, as, for example, when he handles a discretionary account or a hybrid-type account in which the broker has usurped actual control over a technically non-discretionary account."). Evert does not articulate what actions Ironbeam took that constituted an usurpation

14

of control. The parties agree, and the law is clear, that in liquidating Evert's account, Ironbeam acted within its rights and without exercising anything more than the ordinary control with which a broker may act. *First Am. Disc. Corp. v. Jacobs*, 756 N.E.2d 273, 280, 324 Ill. App. 3d 997, 258 Ill. Dec. 291 (2001) ("[T]he pervasive federal regulatory paradigm in the area of futures trading is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore permits the liquidation of a customer's under-margined account without prior demand or notice."). Evert does not list another action that Ironbeam took in exerting control over his account; instead, he rehashes his arguments that Ironbeam should have placed various risk management controls on his account instead of faithfully executing his orders. The Court thus finds that Ironbeam did not "usurp control" over Evert's account and did not owe him any higher fiduciary duty than to faithfully execute his orders.

The Court, therefore, finds that Evert's counterclaim based on breach of fiduciary duty fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court grants Ironbeam's motion for summary judgment [38] and enters judgment against Evert on Count I of Ironbeam's amended complaint [15], in the amount of $138,786.96 plus interest, costs, and attorneys' fees. The Court dismisses Count II of Ironbeam's amended complaint as moot. The Court also enters judgment in favor of counter-defendant Ironbeam on Counts I and II of Evert's counterclaims [16] and terminates the case.

Dated: October 21, 2019

_____
SARA L. ELLIS
United States District Judge